UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
**JUDY SEDENS,**                        )
                                        )
      **Plaintiff,**          )
                                        )
      **v.**                 )     **Civil Action No. 10-12127-DJC**
                                        )
**METROPOLITAN LIFE INSURANCE**         )
**COMPANY and THE LEGG MASON**          )
**COMPANY LLC LONG TERM DISABILITY**    )
**PLAN,**                               )
                                        )
      **Defendants.**         )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                            March 8, 2012

### I.    Introduction

      Plaintiff Judy Sedens ("Sedens") brings this action against the Legg Mason Company LLC Long Term Disability Plan (the "Plan") and the Plan's administrator, the Metropolitan Life Insurance Company ("MetLife") (collectively, "Defendants"), under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132 *et seq*., alleging that MetLife improperly found her eligible for only two years of medical benefits rather than the long-term benefits sought by Sedens. Sedens and the Defendants have each moved for judgment on the record; Sedens seeks to have the Court overturn MetLife's determination and award Sedens long-term benefits, while Defendants seek a judgment in favor of MetLife's eligibility determination. For the reasons set forth below, the Defendants' motion is GRANTED and Sedens' motion is DENIED.

1

## II.     Factual and Procedural Background[1]

### A.     The Plan

The Plan is generally administered by Legg Mason and administered for claims purposes by MetLife. AR 59-61. Specifically, MetLife has "discretionary authority to interpret the terms of the Plan and to determine eligibility to Plan benefits in accordance with the terms of the plan," and its decisions are, according to the Plan, entitled to "full force and effect, unless it can be shown that the interpretation of determination was arbitrary and capricious." AR 61. MetLife is liable for benefits payable under the Plan. AR 59.

Under the terms of the Plan, a claimant is "disabled" if, "due to sickness or as a direct result of accidental injury, [a claimant is] unable to earn: during the Elimination Period[2] and the next 24 months of sickness or accidental injury, more than 80% of [the claimant's] predisability earnings at [the claimant's previous] occupation from any employer in [the claimant's] local economy; and after such period, more than 80% of [the claimant's] predisability earnings from any employer in [the claimant's] local economy at any gainful occupation for which [the claimant is] reasonably qualified taking into account [the claimant's] training, education and experience." AR 24.

The Plan states that if a claimant is "disabled due to [a] neuromusculoskeletal and soft tissue disorder" such as fibromyalgia or many forms of arthritis, disability benefits will be limited to a period of 24 months, "unless the Disability has objective evidence" of any of the six following

---

[1] Unless otherwise noted, all facts are drawn from the administrative record ("AR") agreed to by the parties and submitted to the Court on September 16, 2011. AR, D. 15.

[2] Under the terms of the Plan, an "Elimination Period" is a "period of continuous disability that must be satisfied before [a claimant is] eligible to receive benefits from MetLife." AR 25, 75. In Sedens' case, the Elimination Period was "six months (180 days) of continuous disability." AR 75.

conditions: "seropositive arthritis; spinal tumors, malignancy, or vascular formations; radiculopathies; myelopathies; traumatic spinal cord necrosis; or musculopathies." AR 46. These so-called "exclusionary diagnoses" are individually defined in the Plan, and three of the diagnoses are relevant to this case. "Radiculopathies" are defined as "disease of the peripheral nerve roots supported by objective clinical findings of nerve pathology." AR 47. "Myelopathies" are defined as "disease of the spinal cord supported by objective clinical findings of spinal cord pathology." AR 47. "Musculopathies" are defined as "disease of muscle fibers, supported by pathological findings on biopsy or electromyography (EMG)." AR 47.

B.   Sedens' Medical History

Sedens worked as a receptionist at a series of financial institutions, including Batterymarch Financial Management, a subsidiary of Legg Mason. AR 645, 654, 660. As an employee of Batterymarch, Sedens participated in the Plan. AR 59-61.

Beginning in 2001, while working for Batterymarch, Sedens began receiving treatment for severe joint and muscle pain and flu-like symptoms including fevers. AR 645, 648. Her primary care physician, Dr. Michael Bader, referred her to a rheumatologist who reported on January 4, 2005 that Sedens "appears to have a syndrome most compatible with fibromyalgia and chronic fatigue syndrome" and that this was "apparent a few years ago." AR 637. Dr. Bader referred Sedens to a hematologist who reported back to Dr. Bader on August 26, 2005, noting Sedens' prior diagnoses of fibromyalgia and chronic fatigue syndrome and reporting that Sedens' immunoglobulin levels were "within normal levels." AR 634. On September 21, 2006, Sedens saw an infectious disease specialist, who after examining Sedens expressed "doubt that [Sedens'] constellation of symptoms represents infection." AR 488.

On January 26, 2007, Dr. Bader issued a letter stating that Sedens "will be out of work for the next four weeks due to an unexplained febrile illness" and that she "is currently being evaluated for immune system dysfunction," AR 586, and Sedens ceased working as of that date. AR 645, 660. Sedens continued to see infectious disease specialists, hematologists and rheumatologists, who were unable to confirm any explanation for Sedens' fevers and flu-like symptoms other than her fibromyalgia. AR 484-85, 491-93, 500-03, 587-89. On March 16, 2007, Dr. Bader issued another letter, roughly identical to his letter of January 26, 2007, stating that Sedens will be out of work for an additional four weeks. AR 590. On April 30, 2007, Sedens was seen by an immunologist, who stated that Sedens' "immunodeficiency work-up has been entirely unrevealing." AR 453. On May 25, 2007, Sedens was seen again by one of her rheumatologists who stated that "her examination showed findings consistent with fibromyalgia and possible early osteoarthritis." AR 490.

C.     Sedens' Claims for Benefits

On May 29, 2007, Sedens submitted a claim for long-term disability to MetLife via her employer on May 29, 2007. AR 645-54. In support of her claim, she provided an attending physician statement by Dr. Bader stating that Sedens had a primary disabling diagnosis of fibromyalgia, a secondary disabling diagnosis of seronegative rheumatoid arthritis, and symptoms including "fatigue, malaise [and] fever." AR 581. Sedens also provided the medical reports compiled by her various hematologists, rheumatologists, and immunologists. AR 479-642.

On July 19, 2007, MetLife denied Sedens' claim, stating that she "had consistently normal physical exam findings" and that her "reported symptoms do not rise to a level of impairment that would prevent [her] from performing the sedentary duties . . . as a receptionist," AR 419, and that accordingly she was not disabled as that term was defined under the Plan. AR 404. Sedens appealed to a MetLife claims specialist on December 27, 2007. AR 398.

Sedens continued to see rheumatologists during the pendency of her administrative appeal. On July 20, 2007, rheumatologist Dr. Sharon Stotsky treated Sedens and diagnosed her with "undifferentiated connective tissue disease" in addition to fibromyalgia. AR 416. On October 2, 2007, one of Sedens' previous rheumatologists re-examined her and maintained a "working diagnosis of fibromyalgia" and stated that some of Sedens' pain "is due to early osteoarthritis." AR 364. On December 2, 2007, Dr. Bader stated that Sedens' "multiple medical problems" included "polyarthritis" and "possible superimposed fibromyalgia." AR 402. Sedens submitted these reports to MetLife. AR 360-65, 392-402, 405-17.

On March 31, 2008, MetLife affirmed its denial of Sedens' claim. AR 298.

Under the terms of the Plan, Sedens was required to apply for disability benefits from the Social Security Administration ("SSA") in addition to Plan benefits. AR 655. She did so, and on July 19, 2008, requested a hearing before an Administrative Law Judge ("ALJ") to adjudicate her social security claim. AR 287. On February 4, 2009, the ALJ found that Sedens was unable to perform her prior work as a receptionist on account of, among other things, her fibromyalgia and arthritis and awarded her social security disability benefits. AR 287, 292-93.

D.      "Courtesy Review"

On March 10, 2009, on the heels of the ALJ's decision in Sedens' favor, Sedens notified MetLife of her approval for social security benefits and requested that MetLife revisit its denial of Sedens' claim in light of the ALJ's determination. AR 283-86. Although the Plan contemplates only one administrative appeal, AR 61, MetLife agreed to perform what it now describes as a "courtesy review of its prior determination." Defendants' Brief, D. 19 at 9.

MetLife had two independent physicians - one board certified in internal medicine, the other board certified in rheumatology - review Sedens' file. On June 6, 2009, the internist issued a report

5

noting that "[e]xhaustive work up including CT scans of chest, abdomen, pelvis, brain, quantitative immunoglobins and numerous physical evaluations have yielded no definitive diagnosis other than fibromyalgia," AR 272, and concluding that Sedens' "physically impairing medical conditions, singly or collectively," do not "rise to a level to preclude the claimant" from doing her sedentary job as a receptionist, although "[r]easonable accommodations are advisable given the diagnosis of fibromyalgia." AR 274. On July 23, 2009, the rheumatologist issued a report that reached a different conclusion, stating that Sedens' "file supports clinical evidence of a physical impairment to any full time occupation from 1/27/07 onward from a seronegative arthritis [and] fibromyalgia," AR 160, and concluding that Sedens' condition "would not allow good work attendance in any full time occupation and would support an impairment from 1/27/07 onward." AR 161.

By letter dated November 30, 2009, MetLife informed Sedens that it was approving her claim for benefits, but only for a closed two-year period beginning at the conclusion of Sedens' "Elimination Period," meaning that Sedens would receive retroactive benefits for the period from July 26, 2007 until July 25, 2009 and would not receive the open-ended benefits Sedens had sought. AR 135. MetLife stated that their "review found that while you are unable to perform the duties of your occupation and have been awarded [SSA benefits], your plan limits benefits for a disability due to a Neuromusculoskeletal and Soft Tissue Disorder or Disease," and "the medical documentation does not support a condition with any . . . exclusionary diagnoses that would extend L[ong] T[erm] D[isability] benefits beyond July 25, 2009." AR 139. MetLife apprised Sedens that she had 180 days to appeal MetLife's decision. AR 140.

E.     Sedens' Additional Medical Evaluation

Sedens continued to receive medical care during the pendency of MetLife's "courtesy review" and final review of her claim. Six events are of particular relevance to the parties' arguments.

On November 7, 2009, Dr. Stotsky, one of Sedens' rheumatologists, performed an MRI of Sedens' left hand and concluded that "there are erosions involving the base of the first metacarpal with some bone marrow edema in the first metacarpal base. The remainder of the examination is normal and I see no evidence of erosive changes elsewhere or tendon abnormality." AR 108.

On November 17, 2009, Sedens underwent an MRI of her lumbar spine area. AR 104. Interpreting the MRI results, Dr. Steven Greenberg found that in the space between Sedens' fourth and fifth lumbar vertebrae, "there may be a small left far lateral disc herniation, potentially touching the left L4 nerve root ganglion[3]," but that "no central canal or foraminal stenosis[4] is present," and accordingly concluded that "at L4-5 there may be a left far lateral disc herniation touching the left L4 nerve root ganglion." AR 104. Additionally, Dr. Greenberg found that in the space between Sedens' first and second lumbar vertebrae, "there is a bulging of the intervertebral disc," but that "[t]he central spinal canal, including foramen and facet joints are normal," and accordingly concluded that "at L1-2 there is disc bulging." AR 104.

On December 15, 2009, Sedens underwent an MRI of her cervical spine area. AR 106. Interpreting the MRI results and comparing them to an MRI of Sedens' cervical spine taken in 2006, Dr. Peter Lee found that in the space between Sedens' sixth and seventh cervical vertebrae, "there

---

[3] A ganglion is a bundle of nerve cells that serves as a sort of relay point in the nervous system.

[4] Canal stenosis is narrowing of the spinal canal through which nerves travel; foraminal stenosis is narrowing of the small holes through which nerves exit the spine.

is a new small central disc protrusion which is not causing canal stenosis nor indenting the [spinal] cord," and accordingly concluded that there was a "new small central disc protrusion at C6/7 without canal stenosis or neural impingement."  AR 106.

On December 17, 2009, Dr. Albert Fullerton performed an electrodiagnostic study on Sedens that "reveal[ed] evidence of mild bilateral carpal tunnel syndrome (median nerve entrapment at wrist), slightly worse on the right and affecting sensory components," and concluded that "[t]here is no concrete evidence of cervical radiculopathy."  AR 110.

On April 15, 2010, Sedens was seen by Dr. Shapur Ameri, a neurosurgeon, who interviewed her and performed a physical examination.  AR 114.  In a letter written that same day and provided to Dr. Bader, Dr. Ameri noted that Sedens "has had MRI of cervical and lumbar spine which has shown evidence of disc herniation," referring to the MRIs conducted on November 17 and December 15, 2009, and stated that "I believe she is suffering from cervical radiculopathy and lumbar radiculopathy due to cervical and lumbar disc herniation."  AR 114.

Finally, on April 21, 2010, Dr. Bader drafted a letter "to comment about [Sedens'] long-term disability and social security claims."  AR 115.  He summarized Sedens' various recent medical evaluations as follows:

> Recently, Ms. Sedens has . . . been complaining of left thigh pain, paresthesias,[5] and low back pain.  The patient also reports that her back pain radiates down to her left leg and she can only sit or stand for limited amounts of time due to the pain.  The patient underwent a recent MRI of her lumbar spine, which revealed at L4-5 there may be a left far lateral disc herniation touching the left L4 nerve root ganglion . . . . [and] L1-2 disc bulging . . . .  The patient was then referred to a neurosurgeon for a second opinion who believes she is suffering from lumbar disc radiculopathy . . . .  The patient has also been suffering from neck pain and bilateral hand paresthesias

---

[5] A paresthesia is a sensation of tingling, burning, pricking or numbness in the skin, commonly referred to as a feeling of "pins and needles" or of a limb or other bodily area "falling asleep."

and therefore underwent an MRI of her cervical spine and an EMG of her arms. Her cervical MRI revealed a new small disc protrusion at C6-7 without canal stenosis or neural impingement and again was referred to the neurosurgeon . . . who believes she is also suffering from cervical radiculopathy . . . . Her EMG revealed mild bilateral carpal tunnel syndrome (median nerve entrapment at wrist), slightly worse on the right and affecting sensory components.

AR 115.

On May 26, 2010, Sedens sent a letter via counsel to MetLife enclosing Dr. Stotsky's report regarding her November 7, 2009 MRI, Dr. Greenberg's report regarding her November 17, 2009 MRI, Dr. Lee's report with regard to her December 15, 2009 MRI, Dr. Fullerton's report regarding his December 17, 2009 electrodiagnostic study on Sedens, Dr. Ameri's April 15, 2010 letter, and Dr. Bader's April 21, 2010 letter. AR 117-19. In the letter, Sedens asserted that these materials constituted "medical documentation that complies with the objective evidence of radiculopathies that is required under the terms" of the Plan. AR 117.

F.    Final MetLife Review

After receiving Sedens' May 26, 2010 letter, MetLife asked Dr. Douglas Haselwood, "an independent physician consultant, board certified in Internal Medicine and Rheumatology," AR 78, to review Sedens' "entire claim [file]" (including the reports enclosed in Sedens' May 26, 2010 letter), AR 78, and opine on whether Sedens' "medical information support[s] the diagnosis of [among other things] radiculopathies, myelopathies . . . or musculopathies." AR 88. On July 19, 2010, after reviewing Sedens' file but before drafting his opinion, Dr. Haselwood attempted to hold a teleconference with Dr. Stotsky, "but was contact[ed] instead by [an employee] from Dr. Stotsky's office . . . [who] stated that Dr. Stotsky was treating Ms. Sedens for rheumatoid arthritis . . . [but] did not have any more details regarding Ms. Sedens or any further information to give." AR 79, 87. Similarly, on July 19 and 20, 2010, Dr. Haselwood "attempted to hold a teleconference with Ms.

Sedens' neurosurgeon, Dr. Ameri[,] and her pulmonologist, Dr. Bader; however [Dr. Haselwood]'s messages were not returned." AR 79, 87-88.

On July 20, 2010, Dr. Haselwood drafted and forwarded to MetLife an report that states, in relevant part:

> I reviewed all the medical records submitted for review. Spanning a time of five plus years and incorporating multiple subspecialty evaluations to include rheumatology, infectious disease, allergy / immunology, hematology and neurosurgery, the abundant medical records document extensive evaluation of Ms. Sedens for numerous fluctuating and intertwined signs and symptoms. From the standpoint of potentially significant rheumatologic problems, the subspecialty consults have tended to provide a diagnostic consensus of Ms. Sedens' involvement with a fibromyalgia-like syndrome intertwined with . . . discogenic disease in the cervical and lumbar spine as documented by imaging studies. Unfortunately, fairly extensive surveillance and repetitive rheumatologic-related lab has failed to yield anymore definitive diagnosis. . . .

> In answer to your specific question[] . . . . Does the medical information support the diagnosis of seropositive arthritis; spinal tumors, malignancy, or vascular malformations; radiculopathies; myelopathies; traumatic spinal cord necrosis; or musculopathies? . . .

> No. Ms. Sedens was under rheumatologic surveillance/treatment for seronegative rheumatoid arthritis, but the objective documentation, the nature, and severity of this problem is not well documented in the records. Based on the currently available medical records, there is no evidence to substantiate the diagnoses of seropositive arthritis, spinal tumors, malignancy, vascular malformations, radiculopathies, myelopathies, traumatic spinal cord necrosis, or musculopathies. The medical information from the available medical records indicates that the patient's treating physicians are consciously reporting all of Ms. Sedens' perception of symptomatology and resulting physical impairments, but do not correlate them with unusually severe musculoskeletal pathophysiology that would be expected to yield substantial physical impairments.

AR 88-89. In his report, Dr. Haselwood specifically reaffirmed his independence from MetLife, stating "I attest to the fact that there is no conflict of interest with this review for referring entity, benefit plan, enrollee /consumer, attending provider, facility, drug, device or procedure" and "I attest that my compensation is not dependent on the specific outcome of my review." AR 89.

On July 26, 2010, MetLife faxed a copy of Dr. Haselwood's report to Drs. Stotsky, Ameri and Bader, and asked them to "send their comments on the report, specifically addressing but not limited to Ms. Sedens' documented diagnoses, impairments, restrictions and/or limitations," and, in the event "they were not in agreement with the report," asked that they "submit clinical evidence in support of their conclusions." AR 79. MetLife received no further information from Drs. Stotsky, Ameri and Bader. AR 79.

By letter dated August 12, 2010, MetLife informed Sedens that it had completed review of her claim and stated that "the original determination to terminate benefits beyond July 25, 2009, is upheld upon appeal review." AR 77. MetLife's letter recounted the steps MetLife had taken in reviewing Sedens' claim and concluded that "there is no medical evidence that supports that Ms. Sedens has any of the neuromusculoskeletal/soft tissue exclusionary diagnos[e]s including radiculopathy as defined by the [Plan]. There is no evidence with objective clinical findings to support the diagnosis of radiculopathy which is a documented disease[] of the peripheral nerve root and supported by objective clinical findings of nerve root pathology." AR 79. Accordingly, MetLife stated that "the previous decision to terminate L[ong] T[erm] D[isability] benefits for the time period in question was appropriate and remains in effect." AR 79.

G.    The Instant Complaint

On December 9, 2010, Sedens filed the instant complaint, alleging that she had provided to MetLife substantial objective evidence of radiculopathy and that MetLife's conclusion to the

contrary was arbitrary and capricious and denied her benefits in violation of 29 U.S.C. § 1132(a)(1)(B).  Complaint, D. 1 at ¶¶ 39, 43.[6]

On August 22, 2011, Sedens moved for judgment on the record and submitted a brief arguing that MetLife failed to "negate the objective evidence of radiculopathy" allegedly provided to MetLife by Sedens.  Plaintiff's Brief, D. 14-1 at 11.  She also argued, for the first time, that the medical records she provided to MetLife demonstrated objective evidence of not only radiculopathy, but also myelopathies and musculopathies.  Id. at 5, 9-11.

On September 22, 2011, MetLife cross-moved for judgment on the record.  Objection to Plaintiff's Motion, D. 18; Defendant's Motion, D. 17; Defendant's Brief, D. 19.

Sedens filed her reply on October 13, 2011.  Plaintiff's Reply, D. 21.

The Court heard argument on the cross-motions on February 8, 2012 and took the matter under advisement.

## III.  Discussion

### A.  Standard of Review

An ERISA plan administrator's claims determination that is subsequently challenged under 29 U.S.C. § 1132(a)(1)(B) is reviewed under a de novo standard unless the plan administrator is granted clear discretionary authority to determine eligibility for benefits or to construe the terms of the plan at issue, in which case the decision is reviewed under an arbitrary and capricious / abuse of discretion standard.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 107, 115 (1989);

---

[6] The complaint also alleged, in a separate count (Count Two), that MetLife had failed to provide Sedens with Dr. Haselwood's report, which she asserted she was entitled to under 29 U.S.C. § 1132(a)(1)(A).  Complaint, D. 1 at ¶¶ 46-49.  MetLife subsequently provided Sedens with the report and, at oral argument before the Court on February 8, 2012, Sedens agreed to abandon her § 1132(a)(1)(A) claim.

Denmark v. Liberty Life. Assurance Co. of Boston, 566 F.3d 1, 9 (1st Cir. 2009).  This standard of review is deferential; that is, "the administrator's decision must be upheld if it is reasoned and supported by substantial evidence."  Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004).  "Evidence is substantial if it is reasonably sufficient to support a conclusion, and the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary."  Id.

Here, the Plan states that MetLife "shall have discretionary authority to interpret the terms of the plan and determine eligibility for and entitlement to Plan benefits," AR 61, and Sedens concedes that the arbitrary and capricious standard applies.  Plaintiff's Brief, D. #14-1 at 6.  Accordingly, the Court will review MetLife's decision with regard to Sedens' claim under this standard rather than subject MetLife's decision to de novo review.

One factor in the analysis of whether a decision is arbitrary and capricious is the structural conflict of interest present where the party that adjudicates claims is also the party responsible for paying out those claims.  Denmark, 566 F.3d at 5 n.2.  "Courts are duty-bound to inquire into what steps a plan administrator has taken to insulate the decisionmaking process against the potentially pernicious effects of structural conflicts," and these conflicts must "be accorded weight - albeit not necessarily dispositive weight - in the standard of review equation."  Denmark, 566 F.3d at 9.

Here, MetLife protected the integrity of its claims-determination process by referring Sedens' claim to Dr. Haselwood, who was independent from MetLife.  AR 89.  Further, after denying Sedens' initial claim of benefits in its entirety, AR 298, MetLife agreed to re-review her claim file and, upon such review, reversed course and granted her two years' worth of benefits (though not the open-ended long-term benefits Sedens sought).  AR 135.  As other courts have noted, a decision to award at least some benefits rather than deny benefits entirely "manifest[s] an approach demonstrating an unbiased interest that favor[s the claim applicant], making the conflict

factor less important (perhaps to the vanishing point)."  Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 362 (4th Cir. 2008) (internal quotations and citation omitted).  Sedens does not assert that MetLife's decision to limit her benefits was a so-called "actual conflict," or, to use Denmark's language, an "instance[] in which the fiduciary's decision was in fact motivated by a conflicting interest."  Denmark, 566 F.3d at 5 n.2.  See generally Plaintiff's Brief, D. #14-1 at 6-7.  Consequently, a structural conflict "will act as a tiebreaker" if the relevant considerations were "closely balanced."  Denmark, 556 F.3d at 8.  However, for the reasons discussed below, the Court finds that the considerations in this case are not closely balanced and, therefore, the Court has accorded MetLife's structural conflict sufficient weight, but not dispositive weight.

B.      Analysis

MetLife stated that it reached its final decision limiting Sedens' benefits to two years because "there is no medical evidence that supports that Ms. Sedens has any of the neuro-musculo-skeletal/soft tissue exclusionary diagnoses, including radiculopathy (as defined by the Legg Mason & Company LLC Long Term Disability plan)," and specifically, that "there is no evidence with objective clinical findings to support the diagnosis of radiculopathy, which is a documented disease of the peripheral nerve root supported by objective clinical findings of nerve root pathology."  AR 79.  This language tracks the definition of "radiculopathy" from the Plan.  AR 47.

Sedens argues that MetLife's conclusion was arbitrary and capricious.  She points to the medical reports she submitted to MetLife on May 26, 2010, and argues that these reports include objective evidence of radiculopathies, myelopathies, and musculopathies and MetLife erred by ignoring this evidence and denying her claim without adequate explanation.  The Court finds these arguments unavailing for the reasons discussed below.

1.      Radiculopathies

The primary piece of evidence Sedens points to in support of her argument is the April 15, 2010 letter written by her neurosurgeon, Dr. Ameri. Plaintiff's Brief, D. #14-1 at 9; Plaintiff's Reply, D. #21 at 5-6. Close review of Dr. Ameri's letter undermines the position that the letter itself includes "objective evidence [of] . . . disease of the peripheral nerve roots supported by objective clinical findings of nerve root pathology," as required by the Plan for a finding of an exclusionary diagnosis of radiculopathy. AR 46-47. Dr. Ameri's letter does explicitly state "I believe [Sedens] is suffering from cervical radiculopathy and lumbar radiculopathy due to cervical and lumbar disc herniation." AR 114. But the letter also asserts that Sedens "has had MRI of cervical and lumbar spine which has shown evidence of disc herniation," AR 114 (emphasis added), even though Sedens' lumbar MRI showed only what "may be a small . . . herniation, potentially touching the L4 nerve ganglion," AR 104 (emphasis added) and her cervical MRI showed only a "small central disc protrusion," not necessarily a hernia, which "is not causing canal stenosis nor indenting the [spinal] cord," AR 106 (emphasis added), and the letter makes clear that Dr. Ameri's belief with regard to whether Sedens suffers from radiculopathies is based on his belief that she suffers from disc herniation. AR 114. Additionally, when discussing the lumbar spine MRI interpreted by Dr. Greenberg, Dr. Ameri's letter omits Dr. Greenberg's statement that the MRI reveals "no central canal or foraminal stenosis is present." AR 104.

It is not clear whether Dr. Ameri misread the underlying MRI results and thought they were more conclusive than they were, or whether he reached his belief by reading the MRIs and supplementing his understanding of them with the results of his personal observation of Sedens, which included listening to her description of the pain she was experiencing and performing a straight leg raising test. AR 114. The record shows that Dr. Haselton tried repeatedly to contact Dr. Ameri to allow him to explain his letter more fully and to disagree with Dr. Haselton's initial

15

assessment that Ms. Sedens had not shown evidence of radiculopathies, but Dr. Ameri did not respond to Dr. Haselton's overtures. AR 78-79, 87. What is clear is that Dr. Ameri did not perform his own MRI or electrodiagnostic study, nor did he support his stated belief by setting forth any objective findings of his own showing herniation or evidence of radiculopathies. AR 114. Accordingly, Dr. Ameri's letter is not in conflict with Dr. Haselton's report, which noted that even considering Sedens' neurological medical records (including Dr. Ameri's letter) Sedens' medical information contained "no evidence to substantiate the diagnoses of . . . radiculopathies," AR 89, nor is it in conflict with MetLife's ultimate determination that Sedens' medical records contained " no evidence with objective clinical findings to support the diagnosis of radiculopathy." AR 79.

Nor did the other medical records submitted by Sedens to MetLife contain evidence of radiculopathies contrary to the conclusions of Dr. Haselton and MetLife. First, as already noted, the December 11, 2009 lumbar spine MRI interpreted by Dr. Greenberg only goes so far as to show that "there <u>may</u> be a small left fax lateral disc herniation, <u>potentially</u> touching the L4 nerve ganglion" and that "no central canal or foraminal stenosis is present," AR 104 (emphasis added), and the December 15, 2009 cervical spine MRI interpreted by Dr. Lee showed only a "new small central disc protrusion which is <u>not</u> causing canal stenosis <u>nor</u> indenting the cord." AR 106 (emphasis added). These reports are neither evidence of "disease of the peripheral nerve roots" nor "objective clinical findings of nerve root pathology." AR 79. The November 7, 2009 MRI performed by Dr. Stotsky showed that "there are erosions involving the base of [Sedens'] first metacarpal with some bone marrow edema in the first metacarpal base," but made no mention of radiculopathy or any nerve damage and Dr. Stotsky noted that other than the erosion and bone marrow edema in one metacarpal, "[t]he remainder of the examination is normal and I see no evidence of erosive changes elsewhere or tendon abnormality." AR 108. The December 17, 2009 electrodiagnostic study

performed by Dr. Fullerton did reveal some "median nerve entrapment at [Sedens'] wrist" which Dr. Fullerton diagnosed as carpal tunnel syndrome, but Dr. Fullerton explicitly concluded even in light of this nerve problem that "[t]here is no concrete evidence of cervical radiculopathy." AR 110. Finally, Dr. Bader's letter of April 21, 2010 accurately summarizes the medical records provided by Sedens to MetLife, including Dr. Ameri's belief that Sedens suffers from radiculopathies, but provides no new evidence with regard to radiculopathies. AR 115-16.

Sedens argues that MetLife erred by relying on the opinion of Dr. Haselton instead of Dr. Ameri, both because Dr. Ameri treated Sedens and Dr. Haselton did not, and because Dr. Ameri is a neurologist and Dr. Haselton is an internist and rheumatologist. Plaintiff's Brief, D. #14-1 at 10, Plaintiff's Reply, D. #21 at 6-9. Because Dr. Haselton's opinion correctly characterizes Dr. Ameri's opinion and the two opinions are not in conflict - neither precludes the possibility of radiculopathies as the term is used in general medical practice and that Sedens' medical records lacked "objective evidence" of "disease of the peripheral nerve roots supported by objective clinical findings of nerve pathology" necessary to establish radiculopathy as that term is used by the Plan, AR 46-47 - Sedens' argument is inapposite. Nonetheless, even if the two opinions were construed so as to be in conflict, it would not be arbitrary or capricious for MetLife to rely on Dr. Haselton's opinion rather than Dr. Ameri's. When reviewing and treating physicians give differing opinions, "[i]t is the responsibility of the [plan] [a]dministrator to weigh conflicting evidence," Vlass v. Raytheon Emps. Disability Trust, 244 F.3d 27, 32 (1st Cir. 2001), and "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on [plan] administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). Here, especially given that Dr. Haselton's opinion is based on a thorough and

accurate review of Sedens' complete medical file and Dr. Ameri's is based on a possible misstatement of the underlying record, it would not be arbitrary or capricious for MetLife to rely on the former as opposed to the latter. Similarly, given that Sedens' partially successful claim was based on conditions arising from her fibromyalgia and seronegative arthritis, it would not be arbitrary or capricious to rely on the opinion of a rheumatologist, who specializes in soft tissue diseases, rather than a neurologist.

Finally, to the extent Sedens asserts that MetLife erred by failing to consider the medical records Sedens submitted in support of her claim, Plaintiff's Reply, D. 21 at 7-10, the record makes clear that both MetLife and Dr. Haselton did in fact consider these records and Sedens' invocation of opinions discussing the failure of a plan administrator to consider certain evidence, such as Brigham v. Sun Life of Canada, 317 F.3d 72, 86 (1st Cir. 2003) (Stahl, J., concurring in part and dissenting in part), Colby v. Unumprovident, 328 F. Supp. 2d 186, 191 (D. Mass. 2004) and De Dios Cortés v. MetLife, Inc., 122 F. Supp. 2d 121, 132 (D.P.R. 2000), in support of this assertion is of no aid given the record in this case. Sedens' reliance on Whitehouse v. Raytheon, 672 F. Supp. 2d 174, 179-80 (D. Mass. 2009), in support of her assertion that MetLife is obligated to provide more thorough reasons for rejecting Dr. Ameri's opinion is equally inapposite given that Dr. Ameri's opinion is not inconsistent with either Dr. Haselton's report or with MetLife's final decision with regard to the objective evidence of nerve pathology in Sedens' claim, as discussed above.

For all these reasons, MetLife's determination that Sedens' medical records did not provide evidence of radiculopathies as that term is defined in the Plan was neither arbitrary nor capricious.

2. Myelopathies and Musculopathies

Sedens' arguments with regard to myelopathies and musculopathies, Plaintiff's Brief, D. 14-1 at 5, 9, face another difficulty that her argument about radiculopathies does not. In her

administrative appeal of MetLife's so-called "courtesy review" and its subsequent decision to limit her benefits to two years, Sedens asserted that she had medical documentation that contained objective evidence of radiculopathies, but did not assert that the documentation contained objective evidence of myelopathies or musculopathies.  AR 117-19.  Accordingly, MetLife never had the opportunity to consider Sedens' objections with regard to myelopathies and musculopathies.  See generally 29 U.S.C. § 1133.  It is thus unclear whether Sedens has sufficiently exhausted these claims to permit review in this Court.  See, e.g., Medina v. Metro. Life Ins. Co., 588 F.3d 41, 47 (1st Cir. 2009) ("[a] plaintiff who wishes to raise an ERISA claim in federal court must first exhaust all administrative remedies that the fiduciary provides"); Frost v. Hartford Life & Accident Ins. Co., 2010 WL 335507, at *13 (D.N.H. Jan. 28, 2010) (describing as a "flaw" an ERISA plaintiff's failure to raise an argument before a plan administrator prior to raising the argument in federal court).[7]

Even if Sedens' administrative appeal with regard to radiculopathies is sufficient to preserve her ability to raise arguments in this Court with regard to myelopathies and musculopathies, however, those arguments are also unavailing in light of the record.

As to myelopathies, which are defined in the Plan as "disease of the spinal cord supported by objective clinical findings of nerve pathology," AR 47, Sedens argues that her November 17, 2009 lumbar spine MRI, which Sedens asserts "show[s] a herniated lumbar disc impacting the nerve root," and her December 15, 2009 cervical spine MRI, which Sedens asserts "show[s] a cervical disc protrusion," are sufficient to establish evidence of myelopathies.  Plaintiff's Brief, D. 14-1 at 9.  In fact, as discussed above, the November 17, 2009 lumbar spine MRI showed only that there "may

---

[7] Of similar concern is the fact that it appears that the first time Sedens raised her concerns with regard to myelopathies and musculopathies was in her brief, after omitting discussion of myelopathies or radiculopathies in the complaint she filed with this Court.  See generally Complaint, D. 1.

be" herniation "potentially" touching the nerve root, AR 104, and the December 15, 2009 cervical spine MRI showed that the cervical disc protrusion referred to by Sedens "is not causing canal stenosis nor indenting the cord." AR 106.

As to musculopathies, which are defined in the Plan as "disease of muscle fibers, supported by pathological findings on biopsy or electromyography (EMG)," AR 47, Sedens argues that her December 17, 2009 electrodiagnostic study, which revealed "mild bilateral carpal tunnel syndrome," AR 110, is sufficient to establish evidence of musculopathy. Plaintiff's Brief, D. 14-1 at 9. But the carpal tunnel syndrome revealed in the December 17, 2009 study was, according to Dr. Fullerton's report interpreting the study, a result of "median nerve entrapment at wrist," AR 110, demonstrating that the issue was nervous rather than muscular and thus within the realms of radiculopathies rather than musculopathies - and, as discussed above, Dr. Fullerton's report explicitly stated that "there is no concrete evidence of cervical radiculopathy." AR 110.

Accordingly, while Sedens' medical records do corroborate that she suffers from disabling fibromyalgia and thus is entitled to disability benefits under the Plan, her records do not contain "objective evidence" of radiculopathies, myelopathies or musculopathies as defined in the Plan, AR 46-47, and MetLife's conclusion to that effect and its decision to limit Sedens' benefits to a 24-month period as set forth in the Plan, AR 46, was neither arbitrary nor capricious.

## IV. Conclusion

For the foregoing reasons, the Defendants' motion for judgment on the record is GRANTED and Sedens' motion for judgment on the record is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge